**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email:  mps@stark-stark.com
        scw@stark-stark.com

**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Tel: (973) 228-9898
Fax: (973) 328-0303
Matthew R. Mendelsohn, Esq.
David M. Freeman, Esq.
Email:  mrm@mazieslater.com
        dfreeman@mazieslater.com

*Attorneys for Plaintiffs and Putative Class*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GABRIEL BARRERA ALMONTE and MAYRA MAGADAN MUNOZ; JAMES JACKMAN; MIKI NOLIN; and RICHARD ALLIET; on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FEDEX CORPORATION; AUTOMOTIVE RENTALS, INC.; HOLMAN FLEET LEASING, LLC; HOLMAN AUTOMOTIVE GROUP, INC.; and ABC CORPORATIONS 1-20,<br><br>Defendants. | <u>**Document Electronically Filed**</u><br><br><br>Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## INTRODUCTION

In this putative class action, Plaintiffs allege that Defendants have been engaged in the largest odometer fraud scheme in United States automotive history. Simply stated, Defendants systematically and surreptitiously replace odometers on thousands of used diesel fleet delivery vehicles. The new odometers display zero miles, though Defendants know that the vehicles have, in many cases, been previously driven hundreds of thousands of miles[1]. Defendants continue to use the vehicles, but then later sell the vehicles at a premium, without disclosing that the mileage listed on the odometers is inaccurate. This is a clear violation of federal and state law.

Most times, the large corporate Defendants are successful in perpetrating this fraud against unsuspecting small business owners, who significantly overpay for delivery vehicles that have been driven far more miles than disclosed and are past their useful life expectancy. Therefore, Plaintiffs bring this class action for damages provided under federal and state law, as well as injunctive relief to prevent Defendants from continuing to commit odometer fraud.

## I.   THE PARTIES

1.   Plaintiffs,  Gabriel Barrera Almonte and Mayra Magadan Munoz ("Almonte-Munoz," or collectively with all of the named Plaintiffs, "Plaintiffs"), husband and wife, currently residing in East Palo Alto, California, purchased one of Defendants' motor vehicles. At all times herein, Almonte-Munoz were the victims of odometer fraud, as set forth more specifically below.

2.   Plaintiff,  James Jackman ("Jackman," or collectively with all of the named Plaintiffs, "Plaintiffs"), currently residing in Cape Coral, Florida, purchased one of Defendants'

---

[1]  Commercial diesel-powered motor vehicles have a much longer useful life expectancy than a traditional gasoline-powered family vehicle.

motor vehicles. At all times herein, Jackman was the victim of odometer fraud, as set forth more specifically below.

3.      Plaintiff, Miki Nolin ("Nolin," or collectively with all of the named Plaintiffs, "Plaintiffs"),  currently residing in Knoxville, Tennessee, purchased one of Defendants' motor vehicles. At all times herein, Nolin was the victim of odometer fraud, as set forth more specifically below.

4.      Plaintiff,  Richard Alliet ("Alliet," or collectively with all of the named Plaintiffs, "Plaintiffs"),  currently residing in Virginia Beach, Virginia, purchased one of Defendants' motor vehicles. At all times herein, Alliet was the victim of odometer fraud, as set forth more specifically below.

5.      Defendant, FedEx Corporation ("FedEx," or collectively with the Holman Defendants, "Defendants"), is a Delaware corporation with its corporate headquarters located at 942 South Shady Grove Road, Memphis, Tennessee. At all times herein, FedEx committed odometer fraud, as set forth more specifically below.

6.      Defendant, Automotive Rentals, Inc. ("ARI," or collectively with all of the Defendants, "Defendants"), is a New Jersey Corporation with its principal place of business located at 4001 Leadenhall Road, Mount Laurel, Burlington County, New Jersey. ARI, along with numerous other entities, is marketed under the Holman brand (collectively with all of the Holman Defendants, "Holman"). At all times herein, ARI committed odometer fraud, as set forth more specifically below.

7.      Defendant, Holman Fleet Leasing, LLC ("HFL," or collectively with all of the Defendants, "Defendants"), is a Delaware entity with its principal place of business located at 4001 Leadenhall Road, Mount Laurel, Burlington County, New Jersey. Upon information and

4896-1150-6271, v. 7

belief, the membership of HFL is some combination of the Holman family and other Holman entities, which reside in New Jersey. HFL, along with numerous other entities, is marketed under the Holman brand (collectively with all of the Holman Defendants, "Holman"). At all times herein, HFL committed odometer fraud, as set forth more specifically below.

8.      Defendant, Holman Automotive Group, Inc. ("HAG," or collectively with all of the Defendants, "Defendants"), is a Delaware Corporation with its principal place of business located at 4001 Leadenhall Road, Mount Laurel, Burlington County, New Jersey. HAG, along with numerous other entities, is marketed under the Holman brand (collectively with all of the Holman Defendants, "Holman"). At all times herein, HAG committed odometer fraud, as set forth more specifically below.

9.       Defendants, ABC Corporations 1-20 (collectively with all of the Defendants, "Defendants"), are unknown entities in the chains of title, transfer and/or sale of the motor vehicles in question, and all of their agents and co-conspirators, including, but not limited to auction houses, wholesalers, resellers, and retailers, as well as the subsidiary and parent companies of those entities. At all times herein, ABC Corporations 1-20 committed odometer fraud, as set forth more specifically below.


II.     **JURISDICTION AND VENUE**

10.     This Court has federal question jurisdiction, as these claims are brought based upon Defendants' violation of federal law at 49 *U.S.C.* § 32701 *et seq.*, which specifically permits that "[a] person may bring a civil action to enforce a claim under this section in an appropriate United States district court or in another court of competent jurisdiction," pursuant to 49 *U.S.C.* § 32710(b).

11.     In addition, this Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 *U.S.C.* § 1332(d). Pursuant to 28 *U.S.C.* §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed the sum of $5,000,000, exclusive of interest and costs, and at least one of the Class members is a resident of a different state than Defendants.

12.     Venue is proper in the District of New Jersey pursuant to 28 *U.S.C.* § 1391, because Holman is incorporated under the laws of New Jersey, is a resident of New Jersey, has maintained its principal place of business in, and conducted business in New Jersey for roughly a century. Moreover, ARI transferred the vehicles in question through its New Jersey Motor Vehicle License. Accordingly, as set forth below, a substantial part of the events or omissions giving rise to the claims asserted herein emanate from, and occur in, this District.

## III.     THE ODOMETER ACT

13.     The National Highway Traffic Safety Administration ("NHTSA") estimates that more than 450,000 vehicles are sold each year with false odometer readings. This crime costs American car buyers more than $1 billion annually. *See* www.nhtsa.gov/equipment/odometer-fraud.

14.     According to the United States Justice Department:

> Odometer fraud is a pernicious crime that robs thousands of dollars from each victim it touches . . . The television news magazine *60 Minutes* once characterized it as the largest consumer fraud in America. Victims of this fraud are commonly the least able to afford it, since buyers of used cars include large numbers of low income people. In addition, consumers generally are unaware of being victimized.

> In addition to the cosmetic 'reconditioning' of the car, the odometer tamperer 'reconditions' paperwork. Automobile titles include a declaration of mileage statement to be completed when ownership is transferred. To hide the actual mileage that is declared on the title when the car is sold to an odometer tamperer, the tamperer must

take steps to conceal this information. These steps vary from simple alteration of mileage figures, to creating transfers to fictitious 'straw' dealerships to make it unclear who was responsible for the odometer rollback and title alteration. Alternatively, the odometer tamperers frequently destroy original title documents indicating high-mileage, and obtain duplicate certificates of title from state motor vehicle departments, upon which the false, lower mileage figures are entered.

*See* https://www.justice.gov/civil/case/federal-odometer-tampering-statutes.

15.     While fraud in the sale of an automobile has always been actionable, Congress addressed odometer fraud, in particular, in 1972 by passing the first iteration of The Motor Vehicle Information and Cost Savings Act, then codified at 15 *U.S.C.* § 1981 *et seq.* That original Act was recodified, with nominal changes, in 1994 at 49 *U.S.C.* § 32701 *et seq.* (the "Odometer Act").

16.     Congress succinctly set forth its findings and the purposes of the Odometer Act:

§ 32701. Findings and purposes

a) Findings.—Congress finds that—
1) buyers of motor vehicles rely heavily on the odometer reading as an index of the condition and value of a vehicle;
2) buyers are entitled to rely on the odometer reading as an accurate indication of the mileage of the vehicle;
3) an accurate indication of the mileage assists a buyer in deciding on the safety and reliability of the vehicle; and
4) motor vehicles move in, or affect, interstate and foreign commerce.

b) Purposes.—The purposes of this chapter are—
1) to prohibit tampering with motor vehicle odometers; and
2) to provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers.

17.     Though meant to be interpreted broadly in its reach, the language of the Odometer Act is exceedingly concise and straightforward:

§ 32703. Preventing tampering

A person may not—
1) advertise for sale, sell, use, install, or have installed, a device that makes an odometer of a motor vehicle register a mileage different from the mileage the vehicle was driven, as

registered by the odometer within the designed tolerance of the manufacturer of the odometer;

2) disconnect, reset, alter, or have disconnected, reset, or altered, an odometer of a motor vehicle intending to change the mileage registered by the odometer;

3) with intent to defraud, operate a motor vehicle on a street, road, or highway if the person knows that the odometer of the vehicle is disconnected or not operating; or

4) conspire to violate this section or section 32704 or 32705 of this title.

18.      The Odometer Act goes on to clearly state:

§ 32704. Service, repair, and replacement

a) Adjusting Mileage.—A person may service, repair, or replace an odometer of a motor vehicle if the mileage registered by the odometer remains the same as before the service, repair, or replacement. If the mileage cannot remain the same—

1) the person shall adjust the odometer to read zero; and

2) the owner of the vehicle or agent of the owner shall attach a written notice to the left door frame of the vehicle specifying the mileage before the service, repair, or replacement and the date of the service, repair, or replacement.

19.      The Odometer Act continues, in pertinent part:

§ 32705. Disclosure requirements on transfer of motor vehicles

a)(1) Disclosure Requirements.—Under regulations prescribed by the Secretary of Transportation that include the way in which information is disclosed and retained under this section, a person transferring ownership of a motor vehicle shall give the transferee the following written disclosure:

A) Disclosure of the cumulative mileage registered on the odometer.

B) Disclosure that the actual mileage is unknown, if the transferor knows that the odometer reading is different from the number of miles the vehicle has actually traveled.

2) A person transferring ownership of a motor vehicle may not violate a regulation prescribed under this section or give a false statement to the transferee in making the disclosure required by such a regulation.

20.      Unlike the other sections of the Odometer Act, § 32705 requires an affirmative disclosure by the transferor. The NHTSA promulgated a rule at 49 *C.F.R.* 580.17, holding that certain vehicles are exempt from such disclosures, based upon the age and size of the vehicle. No such exception applies here, because Defendants purposefully altered the vehicle odometers to display a false mileage. Moreover, any such exemption does not apply to § 32703 or § 32704.

21.     Under the Odometer Act, a defrauded purchaser may sue "not only the immediate seller but any other persons in the chain of title who may have been involved in the fraud."

22.     Finally, the Odometer Act permits enforcement by the public in federal court, and provides for statutory damages, costs and attorneys' fees:

§ 32710. Civil actions by private persons

a) Violation and Amount of Damages.—A person that violates this chapter or a regulation prescribed or order issued under this chapter, with intent to defraud, is liable for 3 times the actual damages or $10,000, whichever is greater.
b) Civil Actions.—A person may bring a civil action to enforce a claim under this section in an appropriate United States district court or in another court of competent jurisdiction. The action must be brought not later than 2 years after the claim accrues. The court shall award costs and a reasonable attorney's fee to the person when a judgment is entered for that person.

## IV.    **BACKGROUND**

23.     Plaintiffs allege the following based upon personal knowledge as to allegations regarding Plaintiffs and upon information and belief as to other allegations. The causes of action set forth below are pled alternatively and conjunctively.

24.     FedEx is the ubiquitous, publicly traded courier service started in or around 1971.

25.     According to FedEx's website, www.fedex.com, FedEx employs a team of roughly 600,000 employees, generating annual revenues of approximately $84,000,000,000 worldwide. FedEx runs a fleet of over 210,000 motor vehicles. At all times material herein, FedEx did business and, in particular, repaired, altered, and transferred motor vehicles in New Jersey.

26.     FedEx's website also states:

- Our interests are never served by unlawful or unethical business conduct. FedEx is one of the most trusted brands in the world. Maintaining the highest ethical and professional standards is critical to maintaining this valuable trust.

- We are committed to open, honest and fair dealing with each other and our customers, suppliers and competitors and should not take unfair advantage of anyone through fraud,

8

manipulation, deception, concealment, misrepresentation or any other unfair dealing practice.

27.     Also included on the FedEx website is an open "Letter from the Chairman," stating:

- What guides team members toward trustworthy behaviors is the FedEx Code of Conduct. It shows us how to act lawfully and ethically at all times, even if it costs us business or profits in the short term.

- Please read this Code [of Conduct] to develop a working knowledge of the laws and ethical standards that directly affect your job. In addition, since the Code cannot cover every situation, it's important that you read other FedEx policies, manuals and handbooks as well. Above all, don't hesitate to ask your manager, human resources, or a FedEx attorney to advise you before making a decision.

28.     HAG was founded in 1924 by Steward Holman, and includes automotive dealership, parts distribution, financial, and insurance service components. HAG then founded ARI in 1948, and HFL in 2021. ARI and HFL operate Holman's Fleet & Mobility division. In or around 2023, HAG, ARI, and HFL, along with numerous other entities, began to all be marketed under the Holman brand name banner. All of the Holman entities are still privately owned and operated by the Holman family.

29.     Holman offers a wide range of comprehensive motor vehicle fleet management services to customers such as FedEx. According to Holman's website, www.holman.com, part of those fleet management services includes the remarketing of commercial fleet vehicles:

- Sell with Confidence

  Selling your vehicles requires significant time and effort, especially when you're trying to get the most value. Holman's remarketing services provide access to more channels, putting your vehicles in front of the right buyers at the right time, maximizing proceeds, and reducing time to sale.

30.     Holman is one of the largest fleet management providers in the world, managing roughly 1,300,000 million vehicles for approximately 2,600 clients in the United States, Canada, Mexico, the United Kingdom, and Europe.

31. Holman's website states:

- The foundation of our success has been built on doing the right thing. Our tagline - Driving What's Right – represents our promise that this commitment will continue to guide us in everything we do.

32.     At all times herein, Holman did business and, in particular, repaired, altered, transferred, and sold motor vehicles in New Jersey. Holman also directed all of its activities, including all aspects of its fleet management and remarketing agreements, through its New Jersey automotive dealers license, out of its global headquarters in New Jersey.

33.     In order to run its expansive global courier service, FedEx must meticulously monitor the miles traveled on all of its motor vehicles, as well as the detailed maintenance records of the vehicles, encompassing every detail of the vehicles, such as parts, repairs, inspections, and the like. FedEx accomplishes this through extensive data  collection and storage via various software programs, including FedEx's "Vehicle and Ground Support Equipment Information System." This allows FedEx to quickly and easily know the precise number of miles traveled by each of its vehicles at any given time. This also permits FedEx to quickly and easily know exactly when an odometer is replaced on any FedEx motor vehicle and exactly how many miles were traveled by that vehicle at the time of odometer replacement.

34.     FedEx engaged Holman to manage FedEx's fleet of motor vehicles several years ago. Holman, as FedEx's fleet management vendor, has, at all relevant times, also had access to, and was familiar with, the FedEx monitoring software and detailed vehicle data.

35.     Large courier services like FedEx and United Parcel Service, in consideration of various liability and trademarking concerns, would retire and destroy their older vehicles. Accordingly, Holman originally helped FedEx to identify and scrap FedEx diesel fleet vehicles that had reached the end of their useful lives (typically around 350,000 miles). However, beginning in or around 2011, Defendants determined that they could create an additional revenue stream by remarketing, rather than destroying, FedEx's fleet vehicles.

36.     This remarketing program was scaled up to be applied to the large numbers of used diesel fleet delivery vehicles of the same general size, type, and configuration as the vehicles purchased by Plaintiffs (primarily Freightliner models MT45 and MT55). The basic appearance and design of these utilitarian vehicles, much like delivery tractor-trailers and airplanes, have changed very little over the past several decades. These are the instantly recognizable step vans currently crisscrossing just about every neighborhood in the United States, bearing the FedEx name and colors (the "FedEx/Holman Vehicles"), which are versatile enough to be used by delivery couriers in their current condition or transformed into a number of other uses, such as food trucks.

37.     As part of this remarketing program, Defendants, particularly FedEx and Holman, conspired to commit odometer fraud by entering into a mutual agreement and understanding, knowingly entered by Defendants, with an intent to jointly commit odometer fraud, and did go on to commit thousands of separate instances of odometer fraud. As part of this agreement, FedEx would transfer the FedEx/Holman Vehicles to Holman, then Holman would sell the FedEx/Holman Vehicles at auction, usually to be purchased by a local retailer and eventually sold to the end consumer.

4896-1150-6271, v. 7

38.    All of the transactions involving each of the Plaintiffs followed a similar pattern. Holman is FedEx's exclusive fleet manager and a licensed dealer (ARI holds New Jersey Motor Vehicle License #02750U). Holman would take title to the FedEx/Holman Vehicles from FedEx and bring them to market. In the vast majority of cases, Holman would sell the FedEx/Holman Vehicles through one of about a half dozen large, regional automotive auctions throughout the nation (known in the industry by such names as Manheim,  ADESA, South Bay Auto Auction, Americas Auto Auctions, Bob McConkey's Auction Group, and David Andrews Dealers Auto Auction Group of Tennessee). Holman would sign and transfer the title for the FedEx/Holman Vehicle to the purchaser and complete the odometer disclosure section of the title.

39.    At all times herein, neither FedEx nor Holman acknowledged in the odometer disclosure that the odometer display of the FedEx/Holman Vehicle was "Not Actual Miles (Not Actual)," or that the odometers were replaced and the mileage was "True Mileage Unknown (TMU)." Defendants did not make those required acknowledgements because it would have severely affected the values of the FedEx/Holman Vehicles and would have been reflected in the history of the vehicles (i.e., it would appear on the CarFax reports).

40.    Once Defendants did sell the FedEx/Holman Vehicles at vastly inflated prices, the profits from the sale would be split amongst Defendants.

41.    In furtherance of this scheme, FedEx, with the knowledge and assistance of Holman, replaced thousands of odometers on FedEx/Holman Vehicles. Though odometers, as automotive components, do occasionally wear out or malfunction and need to be replaced, there was no valid reason for this large-scale replacement of the odometers on FedEx/Holman Vehicles, other than to perpetuate their agreement to commit odometer fraud.

4896-1150-6271, v. 7

42.     Moreover, at the time the odometers were replaced, FedEx and Holman knew exactly how many miles had been traveled by the FedEx/Holman Vehicles and could have easily set the new odometers to show the actual mileage of those vehicles. Instead, the new odometers displayed zero miles. There was no valid reason for this failure or refusal to properly set the replaced odometers on FedEx/Holman Vehicles at true mileage, especially knowing that the vehicles would be resold.

43.     Even if the replacement odometers were incapable of being set to the accurate mileage and had to be left at zero miles, Defendants had a legal obligation to "attach a written notice to the left door frame of the vehicle specifying the mileage before the service, repair, or replacement" of the odometer. Defendants purposely failed or refused to attach such a warning because they intended to mislead potential buyers of the vehicles.

44.      The FedEx/Holman Vehicles with replaced, fraudulent odometers were then transferred, marketed, and sold under the false pretenses, including representations and knowing omissions in the title and sales documents, that the mileage displayed on the replaced odometers was accurate, and that the FedEx/Holman Vehicles were lower mileage vehicles, instead of being close to, or past, the end of their useful lives.

45.     Based upon their market share, volume of sales, and supposed expertise, FedEx and Holman were able to more easily pass off the FedEx/Holman Vehicles with fraudulent odometers and otherwise had the ability to exert significant pressure upon any other entities where necessary in the chain of sale of the FedEx/Holman Vehicles.

46.     Defendants all profited through the overpriced sale of FedEx/Holman Vehicles, based upon fraudulent odometer displays, fraudulent title, and sales documents, and a failure or

refusal to make disclosures regarding the fraudulent odometer displays, as required under federal and state law.

47.     Defendants knew, or had reason to know, that the mileage indicated on the odometers of thousands of FedEx/Holman Vehicles was not the actual mileage traveled by the vehicles. Defendants had an affirmative duty to take reasonable steps to discover the actual mileage and inform Plaintiffs and other end consumers of the actual mileage, or to disclose to Plaintiffs and other end consumers in writing that the actual mileage of the FedEx/Holman Vehicles was unknown.

48.     At all times herein, Defendants acted knowingly and with the intent to defraud Plaintiffs and other end consumers, or with reckless disregard of the fact that Plaintiffs and other end consumers were being defrauded. In fact, several Defendants appear to be the subject of a pending individual odometer fraud claim. *See Nev. Fleet LLC v. Fedex Corp.*, No. 2:17-cv-01732-TLN-KJN, 2022 U.S. Dist. LEXIS 54919 (E.D. Cal. Mar. 24, 2022).

49.     This intentional subterfuge allowed the FedEx/Holman Vehicles to be sold for substantially more than they were worth. Defendants are all experienced and sophisticated enough to know, and had a duty to inquire and disclose, that the FedEx/Holman Vehicles with replaced odometers were being sold for much more than they were worth.

50.     Defendants also knew, or could easily determine, that the FedEx/Holman Vehicles with replaced odometers had been driven many more miles than indicated on their odometers, through detailed maintenance records or analysis with commercial diagnostic tools, such as engine scans – all of which would accurately disclose the actual miles on the FedEx/Holman Vehicles.

4896-1150-6271, v. 7

51.     The end consumers of the FedEx/Holman Vehicles with replaced odometers are almost always unsuspecting small business owners, like Plaintiffs, whose livelihoods depended on the vehicle. At all times herein, Defendants sought to hide the intentional odometer fraud at every level along the chain of title and sale. Notwithstanding, Defendants deny that they have intentionally committed odometer fraud and continue to commit odometer fraud to this day. Accordingly, Plaintiffs did not discover and could not, with reasonable vigilance and diligence, discover the odometer fraud perpetrated by Defendants at the time of sale.

## V.     FACTUAL ALLEGATIONS RELATING TO PLAINTIFFS

### A. Gabriel Barrera Almonte and Mayra Magadan Munoz

52.     Plaintiffs, Almonte-Munoz, are a husband and wife who wished to open a food truck business. After considering different options, Almonte-Munoz decided to purchase a FedEx/Holman Vehicle with only about 75,000 miles on its odometer, knowing that they needed a low-mileage reliable truck for the business and being concerned about all of the time and money that would have to be invested.

53.     Upon information and belief, FedEx transferred a FedEx/Holman Vehicle with a fraudulent odometer to Holman pursuant to their fleet management and remarketing agreements. Holman then sold the vehicle through an auction known as the South Bay Auto Auction in Stockton, California. The FedEx/Holman Vehicle was eventually transferred to Newark Catering Manufacture in Hayward, California. At all times, FedEx and Holman knew full well that the mileage reflected on the FedEx/Holman Vehicle's odometer was grossly understated, because FedEx and Holman were responsible for replacing the odometer with a zeroed-out odometer,

despite the fact that FedEx and Holman knew exactly how many miles were on the FedEx/Holman Vehicle based upon their own internal records.

54.     Almonte-Munoz took out a small business loan from The Opportunity Fund in San Jose California, and entered into an agreement with Newark Catering Manufacture to purchase the FedEx/Holman Vehicle, which was outfitted and equipped as a food truck, for $114,592.12, and they paid an additional $6,000 more to equip and brand the vehicle, on or about September 26, 2017. At no time were Almonte-Munoz ever given any notice, or any indication whatsoever, that the odometer reading was completely false. In fact, all of the circumstances surrounding the sale, such as the price of the FedEx/Holman Vehicle, the lack of any required notice otherwise, and the odometer disclosure in the title, indicated that the odometer reading was truthful.

55.     Almonte-Munoz used the FedEx/Holman Vehicle to open "Gabe's Hamburgers." Almonte-Munoz spent a large part of their life savings on setting up their business, outfitting, and equipping the FedEx/Holman Vehicle as a food truck. Since this was the culmination of the dream of owning their own business, they believed they were buying what they needed - a dependable, low-mileage vehicle.

56.     In fact, Almonte-Munoz's odometer had been purposefully replaced and zeroed out by FedEx and Holman, and the miles reflected on the odometer were vastly understated, with no legally required notice of same by Defendants on the vehicle or in the chain of title, transfer, and/or sale. Thus, Almonte-Munoz were the victims of odometer fraud.

57.     It was not long until the low-mileage FedEx/Holman Vehicle that Almonte-Munoz were led to believe they had purchased started having the type of performance and maintenance issues to be expected in what Almonte-Munoz had actually purchased - a vehicle

that had been driven for substantially more than 75,000 miles and was past its useful life expectancy.

58.     Almonte-Munoz's FedEx/Holman Vehicle eventually stopped running properly and Almonte-Munoz were informed that their FedEx/Holman Vehicle needed a new engine, forcing Almonte-Munoz to shut down their business.

59.     Almonte-Munoz first discovered that the mileage on the odometer at the time of purchase was not the actual mileage on the vehicle in or about March 2023. Due to Defendants' longstanding, systematic subterfuge, Almonte-Munoz, and all of the purchasers of FedEx/Holman Vehicles, had no way of discovering that their FedEx/Holman Vehicle had a fraudulent odometer and that they were stuck with a vehicle that was worth much less than they had paid for it.

60.     The odometer fraud perpetrated by Defendants caused Almonte-Munoz to incur damages, including, *inter alia*:

 a)     payment of significantly more money than the FedEx/Holman Vehicle was actually worth;

 b)     loss of the extensive amount of time, money, and opportunity required to outfit and equip the FedEx/Holman Vehicle as a food truck;

 c)     diminution in value of the FedEx/Holman Vehicle; and

 d)     unforeseen repair costs, loss of use, loss of business, and loss of income that would not have been incurred if the mileage on the odometer was accurate.

61.     Had Almonte-Munoz had any idea of the true mileage on the FedEx/Holman Vehicle at the time of purchase, or that Defendants were intentionally misrepresenting that

mileage, Almonte-Munoz would never have purchased the FedEx/Holman Vehicle or paid to have the FedEx/Holman Vehicle converted into a food truck.

62.     The odometer fraud perpetrated by Defendants caused Almonte-Munoz to incur unforeseen repair costs, loss of business, diminution in value of the FedEx/Holman Vehicle, and loss of the extensive amount of time and money required to outfit and equip the FedEx/Holman Vehicle as a food truck. These effects, which were devastating to small business owners and their family, were completely foreseeable, intentional, and deliberately concealed at every level of the chain of title, transfer, and/or sale, as part of a nationwide scam.

**B. James Jackman**

63.     Plaintiff, Jackman, wished to open a food truck business. After considering many different options, Jackman decided to purchase a FedEx/Holman Vehicle with only about 12,000 miles on its odometer, knowing that he needed a low-mileage reliable truck for the business and being concerned about all of the time and money that would have to be invested.

64.     Upon information and belief, FedEx transferred a FedEx/Holman Vehicle with a fraudulent odometer to Holman pursuant to their fleet management and remarketing agreements. Holman then sold the vehicle through an auction to AM Enterprise Automotive located in Denver, Colorado. At all times, FedEx and Holman knew full well that the mileage reflected on the FedEx/Holman Vehicle's odometer was grossly understated, because FedEx and Holman were responsible for replacing the odometer with a zeroed-out odometer, despite the fact that FedEx and Holman knew exactly how many miles were on the FedEx/Holman Vehicle based upon their own internal records.

65.     Jackman entered into an agreement with AM Enterprise Automotive to purchase the FedEx/Holman Vehicle, for $6,888.52, in April 2017. At no time was Jackman ever given any notice, or any indication whatsoever, that the odometer reading was completely false. In fact, all of the circumstances surrounding the sale, such as the price of the FedEx/Holman Vehicle, the lack of any required notice otherwise, and the odometer disclosure in the title, indicated that the odometer reading was truthful.

66.     Jackman spent an additional approximately $60,000 outfitting and equipping the FedEx/Holman Vehicle as a food truck, and, in or around March 2018, Jackman opened "Famous Philly Cheese Steak." Jackman spent a large part of his life savings on setting up his business, outfitting, and equipping the FedEx/Holman Vehicle as a food truck. Since this was the culmination of the dream of owning his own business, he believed he was buying what he needed - a dependable, low-mileage vehicle.

67.     In fact, Jackman's odometer had been purposefully replaced and zeroed out by FedEx and Holman, and the miles reflected on the odometer were vastly understated, with no legally required notice of same by Defendants on the vehicle or in the chain of title, transfer, and/or sale. Thus, Jackman was the victim of odometer fraud.

68.     It was not long until the low-mileage FedEx/Holman Vehicle that Jackman was led to believe he had purchased started having the type of performance and maintenance issues to be expected in what Jackman had actually purchased - a vehicle that had been driven for substantially more than 12,000 miles and was past its useful life expectancy.

69.     Despite all of the work in building his business, Jackman is now stuck with his FedEx/Holman Vehicle. He is currently trying to sell at a loss, due to the fraudulent odometer.

70.     Jackman first discovered that the mileage on the odometer at the time of purchase was not the actual mileage on the vehicle in or about April 2023. Due to Defendants' longstanding, systematic subterfuge, Jackman, and all of the purchasers of FedEx/Holman Vehicles, had no way of discovering that their FedEx/Holman Vehicle had a fraudulent odometer and that he was stuck with a vehicle that was worth much less than he had paid for it.

71.     The odometer fraud perpetrated by Defendants caused Jackman to incur damages, including, *inter alia*:

    a)     payment of significantly more money than the FedEx/Holman Vehicle was actually worth;

    b)     loss of the extensive amount of time, money, and opportunity required to outfit and equip the FedEx/Holman Vehicle as a food truck;

    c)     diminution in value of the FedEx/Holman Vehicle; and

    d)     unforeseen repair costs, loss of use, loss of business, and loss of income that would not have been incurred if the mileage on the odometer was accurate.

72.     Had Jackman had any idea of the true mileage on the FedEx/Holman Vehicle at the time of purchase, or that Defendants were intentionally misrepresenting that mileage, Jackman would never have purchased the FedEx/Holman Vehicle or paid to have the FedEx/Holman Vehicle converted into a food truck.

73.     The odometer fraud perpetrated by Defendants caused Jackman to incur unforeseen repair costs, loss of business, diminution in value of the FedEx/Holman Vehicle, and loss of the extensive amount of time and money required to outfit and equip the FedEx/Holman Vehicle as a food truck. These effects, which were devastating to small business owner and his

family, were completely foreseeable, intentional, and deliberately concealed at every level of the chain of title, transfer and/or sale, as part of a nationwide scam.

**C. Miki Nolin**

74.     Plaintiff, Nolin, wished to open a food truck business. After considering many different options, Nolin decided to purchase a FedEx/Holman Vehicle with only 7,669 miles on its odometer, knowing that she needed a low-mileage reliable truck for the business and being concerned about all of the time and money that would have to be invested.

75.     Upon information and belief, FedEx transferred a FedEx/Holman Vehicle with a fraudulent odometer to Holman pursuant to their fleet management and remarketing agreements. Holman then sold the vehicle through an auction to OK Jalil's Motors & Exports located in Fredericksburg, Virginia, in June 2018. At all times, FedEx and Holman knew full well that the mileage reflected on the FedEx/Holman Vehicle's odometer was grossly understated, because FedEx and Holman were responsible for replacing the odometer with a zeroed-out odometer, despite the fact that FedEx and Holman knew exactly how many miles were on the FedEx/Holman Vehicle based upon their own internal records.

76.     Nolin entered into an agreement with OK Jalil's Motors & Exports to purchase the FedEx/Holman Vehicle for $5,150, in September 2018. At no time was Nolin ever given any notice, or any indication whatsoever, that the odometer reading was completely false. In fact, all of the circumstances surrounding the sale, such as the price of the FedEx/Holman Vehicle, the lack of any required notice otherwise, and the odometer disclosure in the title, indicated that the odometer reading was truthful.

77.     Nolin spent an additional approximately $39,200 outfitting and equipping the FedEx/Holman Vehicle as a food truck, and then opened "Ramen Bones." Nolin spent a large part of her life savings on setting up her business, outfitting, and equipping the FedEx/Holman Vehicle as a food truck. Since this was the culmination of the dream of owning her own business, she believed she was buying what she needed - a dependable, low-mileage vehicle.

78.     In fact, Nolin's odometer had been purposefully replaced and zeroed out by FedEx and Holman, and the miles reflected on the odometer were vastly understated, with no legally required notice of same by Defendants on the vehicle or in the chain of title, transfer, and/or sale. Thus, Nolin was the victim of odometer fraud.

79.     It was not long until the low-mileage FedEx/Holman Vehicle that Nolin was led to believe she had purchased started having the type of performance and maintenance issues to be expected in what Nolin had actually purchased - a vehicle that had been driven for substantially more than 7,669 miles and was past its useful life expectancy.

80.     Despite all of the work in building her business, Nolin is now stuck with her FedEx/Holman Vehicle. She is currently trying to sell at a loss, due to the fraudulent odometer.

81.     Nolin first discovered that the mileage on the odometer at the time of purchase was not the actual mileage on the vehicle in or about April 2023. Due to Defendants' longstanding, systematic subterfuge, Nolin, and all of the purchasers of FedEx/Holman Vehicles, had no way of discovering that her FedEx/Holman Vehicle had a fraudulent odometer and that she was stuck with a vehicle that was worth much less than she had paid for it.

82.     The odometer fraud perpetrated by Defendants caused Nolin to incur damages, including, *inter alia*:

a)         payment of significantly more money than the FedEx/Holman Vehicle was actually worth;

b)         loss of the extensive amount of time, money, and opportunity required to outfit and equip the FedEx/Holman Vehicle as a food truck;

c)         diminution in value of the FedEx/Holman Vehicle; and

d)         unforeseen repair costs, loss of use, loss of business, and loss of income that would not have been incurred if the mileage on the odometer was accurate.

83.       Had Nolin had any idea of the true mileage on the FedEx/Holman Vehicle at the time of purchase, or that Defendants were intentionally misrepresenting that mileage, Nolin would never have purchased the FedEx/Holman Vehicle or paid to have the FedEx/Holman Vehicle converted into a food truck.

84.       The odometer fraud perpetrated by Defendants caused Nolin to incur unforeseen repair costs, loss of business, diminution in value of the FedEx/Holman Vehicle, and loss of the extensive amount of time and money required to outfit and equip the FedEx/Holman Vehicle as a food truck. These effects, which were devastating to a small business owner and her family, were completely foreseeable, intentional, and deliberately concealed at every level of the chain of title, transfer, and/or sale, as part of a nationwide scam.

**D. Richard Alliet**

85.       Plaintiff, Alliet, wished to open a food truck business. After considering many different options, Alliet decided to purchase a FedEx/Holman Vehicle with only 89,000 miles on its odometer, knowing that he needed a low-mileage reliable truck for the business and being concerned about all of the time and money that would have to be invested.

86.     Upon information and belief, FedEx transferred a FedEx/Holman Vehicle with a fraudulent odometer to Holman pursuant to their fleet management and remarketing agreements. Holman then sold the vehicle through an auction to a retailer located in Washington D.C., which Alliet found on Craigslist. At all times, FedEx and Holman knew full well that the mileage reflected on the FedEx/Holman Vehicle's odometer was grossly understated, because FedEx and Holman were responsible for replacing the odometer with a zeroed-out odometer, despite the fact that FedEx and Holman knew exactly how many miles were on the FedEx/Holman Vehicle based upon their own internal records.

87.     Alliet purchased the FedEx/Holman Vehicle for approximately $35,000, on October 1, 2017, and paid an additional $6,000 more to equip and brand the vehicle. At no time was Alliet ever given any notice, or any indication whatsoever, that the odometer reading was completely false. In fact, all of the circumstances surrounding the sale, such as the price of the FedEx/Holman Vehicle, the lack of any required notice otherwise, and the odometer disclosure in the title, indicated that the odometer reading was truthful.

88.     Alliet used the FedEx/Holman Vehicle to open "4 Spices." Alliet spent a large part of his life savings on setting up his business, outfitting, and equipping the FedEx/Holman Vehicle as a food truck. Since this was the culmination of the dream of owning his own business, he believed he was buying what he needed - a dependable, low-mileage vehicle.

89.     In fact, Alliet's odometer had been purposefully replaced and zeroed out by FedEx and Holman, and the miles reflected on the odometer were vastly understated, with no legally required notice of same by Defendants on the vehicle or in the chain of title, transfer, and/or sale. Thus, Alliet was the victim of odometer fraud.

4896-1150-6271, v. 7

90.     It was not long until the low-mileage FedEx/Holman Vehicle that Alliet was led to believe he had purchased started having the type of performance and maintenance issues to be expected in what Alliet had actually purchased - a vehicle that had been driven for substantially more than 89,000 miles and was past its useful life expectancy.

91.     After extensive repair bills and business losses, Alliet was forced to sell the FedEx/Holman Vehicle for approximately $8,000 in or about August 2021, and then close his business.

92.     Alliet first discovered that the mileage on the odometer at the time of purchase was not the actual mileage on the vehicle in or about March 2023. Due to Defendants' longstanding, systematic subterfuge, Alliet, and all of the purchasers of FedEx/Holman Vehicles, had no way of discovering that his FedEx/Holman Vehicle had a fraudulent odometer and that he was stuck with a vehicle that was worth much less than he had paid for it.

93.     The odometer fraud perpetrated by Defendants caused Alliet to incur damages, including, *inter alia*:

a)      payment of significantly more money than the FedEx/Holman Vehicle was actually worth;

b)      loss of the extensive amount of time, money, and opportunity required to outfit and equip the FedEx/Holman Vehicle as a food truck;

c)      diminution in value of the FedEx/Holman Vehicle; and

d)      unforeseen repair costs, loss of use, loss of business, and loss of income that would not have been incurred if the mileage on the odometer was accurate.

94.     Had Alliet had any idea of the true mileage on the FedEx/Holman Vehicle at the time of purchase, or that Defendants were intentionally misrepresenting that mileage, Alliet

4896-1150-6271, v. 7

would never have purchased the FedEx/Holman Vehicle or paid to have the FedEx/Holman Vehicle converted into a food truck.

95.    The odometer fraud perpetrated by Defendants caused Alliet to incur unforeseen repair costs, loss of business, diminution in value of the FedEx/Holman Vehicle, and loss of the extensive amount of time and money required to outfit and equip the FedEx/Holman Vehicle as a food truck. These effects, which were devastating to small business owners and their family, were completely foreseeable, intentional, and deliberately concealed at every level of the chain of title, transfer, and/or sale, as part of a nationwide scam.

## VI.    CLASS ALLEGATIONS

96.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to *Fed. R. Civ. P.* 23, for certification of a damages Class under *Rule* 23(b)(3), an injunctive or declaratory Class under *Rule* 23(b)(2), and/or an issue Class under *Rule* 23(c)(4), as representatives of all members of the following nationwide putative Class.

97.    Plaintiffs' odometer fraud claims are brought on behalf of all individuals and entities in the United States, their beneficiaries or estates, and their successors in interest (the putative "Class") who:

    a)    purchased one or more FedEx/Holman Vehicles; and

    b)    the FedEx/Holman Vehicle/s was/were being managed by Holman under its agreements with FedEx; and

    c)    the odometer of the FedEx/Holman Vehicle/s was/were replaced or altered; and

d)      the odometer of the FedEx/Holman Vehicle/s did not reflect the actual miles traveled by the vehicle/s; and

e)      there was no legally required notice under the Odometer Act and/or the New Jersey Consumer Fraud Act.

98.      Excluded from the putative Class are:

a)      Defendants, their parents, subsidiaries, affiliates, officers and directors; any entity in which Defendants have a controlling interest; all of the putative Class members who make a timely election to be excluded; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members;

b)      all putative Class members who executed a release of the claims contained in this Complaint; and

c)      any putative Class members whose claims fall outside of the number of years provided for in the limitations period contained within the Odometer Act, subject to applicable discovery and accrual considerations.

99.      This action has been brought and may be properly maintained on behalf of the putative Class, as defined above, under *Rule* 23 of the *Federal Rules of Civil Procedure*. The requirements of *Rule* 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) are all satisfied.

100.      The members of the putative Class are ascertainable through the use of objective criteria. The identity of all of the members of the putative Class is within the knowledge of Defendants and can be readily ascertained by resort to Defendant's detailed records.

101.       The members of the putative Class are ascertainable through resort to public sale, registration and title records, as well as the records required to be kept by auction houses under 49 *C.F.R.* 580.9:

Each auction company shall establish and retain in physical or electronic format at its primary place of business in an order appropriate to business requirements and that permits systematic retrieval, for five years following the date of sale of each motor vehicle, the following records:
a) The name of the most recent owner (other than the auction company);
b) The name of the transferee;
c) The vehicle identification number; and
d) The odometer reading on the date which the auction company took possession of the motor vehicle.

102.     Plaintiffs' claims satisfy *Rule* 23(a)(1), in that the members of the putative Class are so numerous that joinder is impractical. Plaintiffs reasonably estimate that there are thousands of potential members in this nationwide putative Class.

103.     Plaintiffs' claims satisfy *Rule* 23(a)(2), in that there are numerous and substantial questions of law and fact common to all members of the putative Class. The common issues include, but are not limited to:

a)     Whether Defendants violated the Odometer Act;

b)     Whether FedEx and Holman violated the New Jersey Consumer Fraud Act;

c)     Whether Defendants were unjustly enriched;

d)     Whether Defendants replaced or altered the odometers of thousands of FedEx/Holman Vehicles;

e)     Whether the replaced or altered odometers of thousands of FedEx/Holman Vehicles did not reflect the actual miles traveled by those vehicles;

f)     Whether Defendants issued the legally required notice under the Odometer Act and the New Jersey Consumer Fraud Act;

g)     Whether FedEx and Holman conspired to violate the Odometer Act and the New Jersey Consumer Fraud Act;

h)      Whether Defendants acted with the intent to defraud Plaintiffs and other end consumers, or with reckless disregard of the fact that Plaintiffs and other end consumers were being defrauded;

i)      Whether Defendants continue to violate the Odometer Act, continue to violate the New Jersey Consumer Fraud Act, and continue to be unjustly enriched; and

j)      The proper measure of damages.

104.    Plaintiffs' claims satisfy *Rule* 23(a)(3), in that they are typical of the claims of the members of the putative Class that Plaintiffs seek to represent. Plaintiffs and all members of the putative Class all claim to be harmed through a common course of conduct, actionable through the same statutes and standards, in that they all claim to be victims of odometer fraud in their purchase of FedEx/Holman Vehicles.

105.    Plaintiffs satisfy *Rule* 23(a)(4), in that they will fairly and adequately represent and protect the interests of the members of the putative Class they seek to represent. Plaintiffs have retained Counsel highly experienced in the handling of class actions and litigation. Counsel have the financial resources and are committed to prosecute this action vigorously. Neither Plaintiffs nor their Counsel have interests adverse to those of the putative Class.

106.    In addition to *Rule* 23(b)(3), the putative Class is also suitable for Certification under *Rule* 23(b)(2). Defendants have acted on grounds generally applicable to the members of the putative Class, thereby making final relief appropriate with respect to the putative Class as a whole. The prosecution of separate actions by individual members of the putative Class would create the risk of inconsistent or varying adjudications with respect to the individual members of the putative Class that would establish incompatible standards of conduct for Defendants. The

maintenance of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each putative Class member than would piecemeal litigation.

107.    Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under *Fed. R. Civ. P.* 23(b)(3)(D).

108.    The representative Plaintiffs, like all members of the putative Class, have been monetarily damaged by Defendants' odometer fraud and are entitled to statutory damages, and other remedies, under federal and state law. Defendants' odometer fraud, and the harms flowing therefrom, continues to this day.

109.    These common questions also predominate over any individual issues for purposes of *Rule* 23(b)(3), and a class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)    Given the size of the claims of individual members of the putative Class, as well as the resources of Defendants, few Class members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

b)    This action will permit an orderly and expeditious administration of the claims of putative Class members, will foster economies of time, effort, and expense, and will ensure uniformity of decisions;

4896-1150-6271, v. 7

c)      Any interest of putative Class members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments, and would create a burden on the court system; and

d)      Without a class action, Plaintiffs and putative Class members will continue to suffer damages, Defendants' violations of law will proceed without remedy, and Defendants will continue to reap and retain the substantial proceeds derived from their wrongful and unlawful conduct. Plaintiffs and the putative Class members have suffered damages as a result of Defendants' unlawful and unfair conduct. This action presents no difficulties that will impede its management by the Court as a class action.

110.    Notice can be accomplished by direct notice for most, if not all, members of the putative Class, and targeted publication notice for the remainder.

## VII.   CLAIMS

### COUNT I
### (Odometer Fraud Against All Defendants)
### Violation of 49 *U.S.C.* §§ 32703, 32704, 32705; and relief under 49 *U.S.C.* § 32710

111.    Plaintiffs repeat and reallege all of the foregoing.

112.    Defendants knowingly and systematically disconnected, reset, altered, and/or had disconnected, reset, or altered, the odometers of thousands of FedEx/Holman Vehicles intending to change the mileage registered by the odometers, with the intent to defraud Plaintiffs and other end consumers, or with reckless disregard of the fact that Plaintiffs and other end consumers were being defrauded.

113.    Defendants further conspired to knowingly and systematically service, repair, or replace the odometers of thousands of FedEx/Holman Vehicles without making the mileage registered by the odometers remain the same as before the service, repair, or replacement, with the intent to defraud Plaintiffs and other end consumers, or with reckless disregard of the fact that Plaintiffs and other end consumers were being defrauded.

114.    Defendants further conspired to knowingly and systematically adjust the serviced, repaired, or replace the odometers of thousands of FedEx/Holman Vehicles to read zero, without attaching a written disclosure to the left door frame of the FedEx/Holman Vehicles specifying the mileage before the service, repair, or replacement and the date of the service, repair, or replacement, with the intent to defraud Plaintiffs and other end consumers, or with reckless disregard of the fact that Plaintiffs and other end consumers were being defrauded.

115.    Defendants further conspired to knowingly and systematically fail or refuse to disclose the cumulative mileage registered on the odometers of thousands of FedEx/Holman Vehicles, or to disclose that the actual mileage was unknown, knowing that the odometer readings were different from the number of miles the FedEx/Holman Vehicles had actually traveled, with the intent to defraud Plaintiffs and other end consumers, or with reckless disregard of the fact that Plaintiffs and other end consumers were being defrauded.

116.    In this manner, Defendants falsely represented, and continue to represent, thousands of the FedEx/Holman Vehicles as lower mileage vehicles, instead of being close to or past their useful lives, in order to sell the FedEx/Holman Vehicles for much more than the FedEx/Holman Vehicles were worth, with the intent to defraud Plaintiffs and other end consumers, or with reckless disregard of the fact that Plaintiffs and other end consumers were being defrauded.

4896-1150-6271, v. 7

117.     Defendants are subject to injunctive relief enjoining Defendants from further illegal conduct. Defendants are also liable to Plaintiffs for each and every instance of odometer fraud, in the amount of three times the actual damages caused or $10,000, whichever is greater, plus costs and attorneys' fees.

**COUNT II**
**(New Jersey Consumer Fraud Against FedEx and Holman)**
**Violation of *N.J.S.A.* § 56:8-1, *et seq.***

118.     Plaintiffs repeat and reallege all of the foregoing.

119.     Holman is a New Jersey entity and licensed New Jersey automotive dealer subject to the laws of the State of New Jersey, including the New Jersey Consumer Fraud Act, *N.J.S.A.* § 56:8-1, *et seq.*

120.     FedEx and Holman mutually engaged in acts and omissions which constitute unconscionable commercial practices, deception, fraud, false pretenses, false promises and/or misrepresentations.

121.     FedEx and Holman are "persons," and the FedEx/Holman Vehicles constitute "merchandise" within the meaning of the New Jersey Consumer Fraud Act. FedEx and Holman received payment and other renumeration from the sale of the FedEx/Holman Vehicles.

122.     FedEx and Holman misled and deceived Plaintiffs by making material misrepresentations of fact in connection with the marketing, sale, and maintenance of the FedEx/Holman Vehicles, including but not limited to, conspiring to replace and alter the odometers of the FedEx/Holman Vehicles, and not disclosing or providing required notice to purchasers, in order to misrepresent the actual mileage on the FedEx/Holman Vehicles.

4896-1150-6271, v. 7

123.     FedEx and Holman misled and deceived Plaintiffs by making knowing omissions in connection with the marketing, sale, and maintenance of the FedEx/Holman Vehicles, including but not limited to failing to disclose or provide required notice to purchasers that the odometers of the FedEx/Holman Vehicles were replaced and altered, misrepresenting the actual mileage on the FedEx/Holman Vehicles.

124.     FedEx and Holman made these misrepresentations and knowing omissions with full knowledge of their falsity and also knowingly concealed, suppressed, and/or omitted material facts, in order to induce reliance on the part of Plaintiffs. FedEx's and Holman's misrepresentations and knowing omissions were made in bad faith, in order to sell the FedEx/Holman Vehicles for much more than they were worth.

125.     Plaintiffs did reasonably and justifiably rely on these misrepresentations and omissions.

126.     FedEx's and Holman's acts and omissions constitute unconscionable commercial practices, deception, fraud, false pretenses, false promises and/or misrepresentations and thereby violate the New Jersey Consumer Fraud Act, *N.J.S.A.* § 56:8-1, *et seq.*

127.     FedEx and Holman received valuable consideration from Plaintiffs for the fraudulent sale of the FedEx/Holman Vehicles.

128.     As a direct and proximate result of the aforesaid violations by FedEx and Holman, Plaintiffs have suffered ascertainable loss and have been damaged.

## COUNT III
### (Unjust Enrichment Against All Defendants)

129.     Plaintiffs repeat and reallege all of the foregoing.

4896-1150-6271, v. 7

130.     Plaintiffs conferred a benefit on Defendants by purchasing the FedEx/Holman Vehicles for substantially more money than those vehicles were worth, due to the Defendants' replacement and alteration of the odometers of the FedEx/Holman Vehicles, and Defendants not disclosing or providing required notice to purchasers.

131.     Defendants unjustly profited from the sale of those vehicles at inflated prices as a result of their misrepresentations and knowing omissions regarding the mileage on those vehicles. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiffs.

132.     As a direct and proximate result of Defendants' misrepresentations and knowing omissions, Defendants reaped ill-gotten gains, benefits, and profits, and have been unjustly enriched at the expense of Plaintiffs.

133.     Plaintiffs are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from Defendants' unlawful, unjust, and inequitable conduct. Defendants must disgorge their ill-gotten gains, benefits, and profits, including interest, to Plaintiffs.


**COUNT IV**
**(Civil Conspiracy Against FedEx and Holman)**
**Conspiracy to Commit Odometer Fraud and Violate the New Jersey Consumer Fraud Act**

134.     Plaintiffs repeat and reallege all of the foregoing.

135.     FedEx and Holman entered into fleet management and remarketing agreements for the purposes of committing odometer fraud in direct violation of federal and state law.

4896-1150-6271, v. 7

136.     The primary purpose of the fleet management and remarketing agreements between FedEx and Holman was to commit illegal odometer fraud, violate the New Jersey Consumer Fraud Act, and reap illegal profits by inflicting a wrong and injury upon Plaintiffs.

137.     FedEx and Holman acted overtly and in concert in furtherance of the fleet management and remarketing agreements in order to commit unlawful acts and commit lawful acts by unlawful means.

138.     FedEx and Holman illegally profited from their overt acts under the fleet management and remarketing agreements, at Plaintiffs' expense.

139.     As a direct and proximate result of the aforesaid odometer fraud perpetrated by agreement and in concert by FedEx and Holman, Plaintiffs have suffered and been damaged.


VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the members of the putative Class demand a jury trial on all claims so triable and judgment:

a)     Declaring that Plaintiffs be designated representatives of the Class and that the undersigned be designated Class Counsel;

b)     Declaring that Defendants have violated the Odometer Act, violated the New Jersey Consumer Fraud Act, been unjustly enriched, and engaged in civil conspiracy;

c)     Enjoining Defendants from continuing to violate the Odometer Act, violate the New Jersey Consumer Fraud Act, being unjustly enriched and engaging in civil conspiracy;

4896-1150-6271, v. 7

d)      For statutory damages under the Odometer Act of three times actual damages or $10,000 per violation, whichever is greater;

e)      For treble damages, costs and attorneys' fees under the New Jersey Consumer Fraud Act;

f)      For disgorgement of all ill-gotten gains, benefits and profits;

g)      For any other statutory damages, compensatory damages, punitive damages, and augmented damages;

h)      For prejudgment interest at the maximum rate permitted by applicable law;

i)      For costs and disbursements incurred by Plaintiffs, the Class, and Class Counsel in connection with this action;

j)      For reasonable attorneys' fees for time expended by Class Counsel;

k)      For reasonable incentive awards for the Class representatives; and

l)      For such other and further relief as this Court deems just and proper.


*s/Martin P. Schrama*
By: Martin P. Schrama, Esq.

**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email: mps@stark-stark.com
          scw@stark-stark.com

*s/ Matthew R. Mendelsohn*
By: Matthew R. Mendelsohn, Esq.

**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Tel: (973) 228-9898
Fax: (973) 328-0303
Matthew R. Mendelsohn, Esq.
David M. Freeman, Esq.
Email: mrm@mazieslater.com
          dfreeman@mazieslater.com

## DEMAND FOR A TRIAL BY JURY

Pursuant to *Rule* 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues and defenses.

s/Martin P. Schrama
By: Martin P. Schrama, Esq.

**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email: mps@stark-stark.com
          scw@stark-stark.com

s/ Matthew R. Mendelsohn
By: Matthew R. Mendelsohn, Esq.

**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Tel: (973) 228-9898
Fax: (973) 328-0303
Matthew R. Mendelsohn, Esq.
David M. Freeman, Esq.
Email: mrm@mazieslater.com
          dfreeman@mazieslater.com

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to *Local Rule* 11.2, it is hereby stated that the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding, other than the aforementioned case pending in the United States District Court, Eastern District of California, styled *Nev. Fleet LLC v. Fedex Corp.*, No. 2:17-cv-01732-TLN-KJN, to the best of our knowledge and belief.

s/Martin P. Schrama
By: Martin P. Schrama, Esq.

**STARK & STARK, P.C.**
100 American Metro Boulevard
Hamilton, New Jersey 08619
Tel: (609) 896-9060
Fax: (609) 895-7395
Martin P. Schrama, Esq.
Stefanie Colella-Walsh, Esq.
Email: mps@stark-stark.com
          scw@stark-stark.com

s/ Matthew R. Mendelsohn
By: Matthew R. Mendelsohn, Esq.

**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Tel: (973) 228-9898
Fax: (973) 328-0303
Matthew R. Mendelsohn, Esq.
David M. Freeman, Esq.
Email: mrm@mazieslater.com
          dfreeman@mazieslater.com

4896-1150-6271, v. 7